```
                                    FILED
                              March 12, 2010
                         CLERK, U.S. BANKRUPTCY COURT
                         EASTERN DISTRICT OF CALIFORNIA

                              0002481632
```

1  Hilton A. Ryder, # 54470
   McCormick, Barstow, Sheppard                    (SPACE BELOW FOR FILING STAMP ONLY)
2  Wayte & Carruth LLP
   P.O. Box 28912
3  5 River Park Place East
   Fresno, CA 93720-1501
4  Telephone:   (559) 433-1300
   Facsimile:   (559) 433-2300
5
   Attorneys for Debtor
6

7

8              UNITED STATES BANKRUPTCY COURT

9              EASTERN DISTRICT OF CALIFORNIA

10                    Fresno Division

11 In Re                          Case No. 09-61024-A-11

12 FRANK J. GOMES DAIRY,          Chapter Number: 11
   a California Limited Partnership,
13                                Docket Control #HAR-5
           Debtor.
14                                Dept:     A, Courtroom 11
                                  Judge:    Honorable Whitney Rimel
15

16                        **DISCLOSURE STATEMENT**

17         Frank J. Gomes Dairy, Debtor and Debtor-in-Possession, (hereinafter "Debtor")

18 voluntarily filed the above-captioned case on November 12, 2009, for a reorganization pursuant

19 to Chapter 11 of Title 11, United States Code, with the United States Bankruptcy Court for the

20 Eastern District of California.

21         Debtor has prepared and filed this Disclosure Statement (hereinafter "Disclosure

22 Statement") for the Court's approval with respect to the Debtor, his business, debts and assets.

23         The purpose of this Disclosure Statement is to provide the holders of claims

24 against the Debtor or interest in the Debtor's property with adequate information about the

25 Debtor's business affairs to make an informed judgment as to the merits of accepting or rejecting

26 the Debtor's proposed Plan of Reorganization (hereinafter "Plan").

27 ///

28 ///

The material herein contained is intended solely for the purpose of providing known creditors of the Debtor with adequate information to evaluate the merits of the proposed Plan, and for no other purpose or use.

This is the first Disclosure Statement that has been submitted by the Debtor to the Court during this case.

The Debtor has also filed the Plan with the Court, which said Plan is summarized herein. The material contained herein concerning alternatives to the Plan proposed by the Debtors is limited by both practical considerations of space and are the opinions of the Debtor regarding the same.

In order for the Plan to be accepted by creditors and confirmed by the Court, a majority in number and a two-thirds majority in amount of claims filed and allowed (for voting purposes) and voting in an impaired class must vote to accept the Plan. Assuming this Disclosure Statement is approved by the Court as containing "adequate information," you will be notified as to the procedurally correct way to cast your ballot for acceptance or rejection. If the proposed Plan is not confirmed, the Debtor or other parties-in-interest may propose an alternate Plan or the case may be dismissed or converted to one under Chapter 7.

No representations concerning the Debtor or the Plan are authorized by the Debtor other than set forth in this Disclosure Statement.

## HISTORY OF BUSINESS

Debtor is a limited partnership. The general partner is the Frank J. Gomes Irrevocable Family Trust Dated April 9, 2003, which trust holds a 1% general partnership interest. The Trustee of the Trust is Albert Xavier. The same trust is also a 49% limited partner. The other 50% limited partner is the Frank J. Gomes Separate Trust Dated June 2, 2003. Frank J. Gomes is the Trustee. As the Trustee of the general partner, Albert Xavier is the person authorized to act on behalf of the Debtor-in-Possession.

Debtor operates two dairies. Dairy No. 1 consists of 365 acres at 5301 N. DeAngelis Road, Stevinson, California. Dairy No. 2 consist of 459 acres located at 870 Kniebes Road, Gustine California. The two dairies ("Dairy") are operated as a single entity. The Dairy

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

milks approximately 2,300 cows with an additional 200 dry cows. The Dairy maintains a replacement program and has 1,730 heifers ranging in the age from day old to mature springers.

The only asset of the Frank J. Gomes Separate Trust Dated June 2, 2003, is its limited partnership interest in the Dairy. The only asset in the Frank J. Gomes Irrevocable Family Trust Dated April 9, 2003, is the trust's general and limited partnership interest in the Debtor, except that this trust also owns a 112 acre parcel contiguous to Dairy No. 2 which purchase was financed by Wells Fargo Bank through a loan to the Debtor that in turn loaned to the trust and is additional collateral for the Wells Fargo real estate loan.

Debtor is as vertically integrated as possible for a dairy. Debtor owns all of the farming and harvesting equipment necessary to farm over 1,000 acres and in addition perform harvesting and custom farming work for neighbors. Debtor owns its trucks and trailers to haul its milk to the creamery and owns trucks and trailers to transport commodities. The historically low milk prices in 2009 resulted in operating losses of between $1.00 and $2.00 per day per cow.

The Debtor farms 211 leased acres and approximately 800 acres in Dairy No. 1 and Dairy No. 2 for a total of approximately 1,000 acres. Currently 220 acres are planted to alfalfa which is dormant. The balance is planted to oats. At the time the case was filed, the Debtor had on hand approximately 1,500 tons of hay and 41,000 tons of silage. Debtor must purchase grain and other commodities in addition to feeding the hay and silage on hand.

The Debtor delivers its milk to Saputo Cheese USA, Inc. A. L. Gilbert, Inc. levied on the milk check which resulted in the filing of the Chapter 11.

## **EVENTS DURING CHAPTER 11**

Debtor filed a Motion for Use of Cash Collateral that was granted allowing the continued operation of the Debtor. Any secured creditors whose cash collateral was used was granted a replacement lien in like collateral to the extent of the use of the cash collateral. The three creditors with replacement liens are Wells Fargo Bank, BM&A Retirement Trust ("BM&A") and the claim of A. L. Gilbert. Adequate protection payments are being made to Wells Fargo Bank under the order authorizing the use of cash collateral.

///

1cCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

Debtor began making adequate protection payments consisting of the monthly contractual payment to all of its secured creditors with liens on equipment beginning January 15, 2010, in order to avoid any motions for relief from stay. None have been filed. The collateral of these other secured creditors consist generally of items of equipment.

Debtor has been working closely with its major secured creditors, Wells Fargo Bank and BM&A Retirement Trust to not only negotiate the order for use of cash collateral but also to reach acceptable terms for a plan of reorganization. The results of those negotiations are contained in the Plan. Part of the negotiations also resulted in the sale of Debtor's milk pool quota with net proceeds estimated to be $980.00 All of the proceeds will be used to purchase additional milking cows or springers to increase Debtor's cash flow necessary to meet the requirements of the Plan.

An Unsecured Creditors Committee has been appointed in this case and is represented by attorney Peter Fear.

## SUMMARY OF ASSETS

Dairy No. 1 consists of 365 acres at 5301 N. DeAngelis Road, Stevinson, California and has a value in the opinion of Debtor of $8,400,000.00. It is encumbered by a first deed of trust held by Wells Fargo Bank securing an obligation of about $13,500,000.00 which also encumbers Dairy No. 2 and the additional 112 acres owned by the general partner of Debtor. BM&A Retirement Trust holds a second deed of trust on Dairy No. 1 and Dairy No. 2 securing an obligation of approximately $4,050,000.00 which obligation is also secured by the personal property of Debtor. J.D. Heiskell holds a third a deed of trust on Dairy No. 1 securing an obligation at the time of filing of $1,149,057.65. Stanislaus Farm Supply holds a fourth deed of trust on Dairy No. 1 securing an obligation of $470,253.27.

Dairy No. 2 consists of 459 acres at 870 Kniebes Road, Gustine, California that has a value in the opinion of Debtor of $13,800,000.00. Dairy No. 2 is encumbered by a first deed of trust held by Wells Fargo and a second deed of trust held by BM&A Retirement Trust securing the same obligation as Dairy No. 1. Jim Lyman holds a third deed of trust on Dairy No. 2 securing the balance of $570,000.00. A. L. Gilbert recorded an abstract of judgment which

IcCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

would attach to both Dairy No. 1 and Dairy No. 2 securing an obligation of $601,595.00.

Debtor leases the 112 acres of open ground from Debtor's general partner for the payment of the real property taxes and insurance. The property is necessary for adequate acreage for the number of permitted cows on Dairy No. 2. The fair market value is approximately $1,800,000.00 in the opinion of Debtor. The property is additional collateral to Wells Fargo on the loan secured by real property, BM&A and Jim Lyman. Debtor also leases 48 acres of open ground from Myers Family Farms at $184.00 per acre, 50 acres of open ground from Lewis Bambauer for $200.00 per acre plus a home for employees for $550.00 per month.

Debtor also operates a custom harvest and farming operation under the fictitious name of F&A Farms. Debtor has farming and harvesting equipment sufficient to farm or harvest all of its crops and generate significant additional income as more fully set forth in the attached budgets.

The personal property assets of Debtor at the time the case was filed are generally described as follows.

| DESCRIPTION | AMOUNT |
|---|---|
| Accounts Receivable – F&A Farms | $ 330,000.00 |
| Milk Check | 787,000.00 |
| Automobiles, Trucks and Trailers | 490,842.00 |
| Office Equipment | 5,000.00 |
| Hay Inventory | 225,000.00 |
| Silage Inventory | 2,665,000.00 |
| Livestock | 5,275,460.00 |
| Sudan Silage – net of harvest | 86,625.00 |
| 265 acres of corn silage – net of harvest | 262,350.00 |
| Farming equipment | 1,427,000.00 |
| Pool Quota | 859,000.00 |
| **Total** | **$12,413, 277.00** |

## SUMMARY OF LIABILITIES

The obligations secured by real property are described above. Wells Fargo Bank holds a first security interest in the personal property of Debtor other than the vehicles securing an obligation at the time of filing of approximately $6,000,000.00.

///

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PLACE EAST
FRESNO, CA 93720-1501

BM&A holds a security interest junior to Wells Fargo on the same collateral securing an obligation of approximately $4,050,000.00 at the time of filing.

There are seventeen loans secured by individual items of equipment. The value of the collateral is equal to or greater than the outstanding balance on each loan. All of these items of equipment are retained under the Plan and the obligations are restructured except a Case Swather.

The priority taxes listed in the original schedules total $987,450.00. These consist of payroll taxes due the Employment Development Department for 2009 of approximately $60,000.00 with the Internal Revenue Service Form 943 taxes for the period of 2003 through 2009 making up the balance of the claim.

The unsecured creditors listed in the original schedules total $3,912,408.62. A review of the claims filed are generally consistent with the amount listed in the original schedules.

A summary of the assets and liabilities described and as set forth in the original filed schedules show assets totaling $34,613,277.00 and liabilities totaling $30,930,195.00. The secured obligation to Wells Fargo on the real property has increased by approximately $1,500,000.00 as a result of Debtor's default on an interest swap agreement, however, Debtor remains solvent utilizing the values in the original schedules.

## LIQUIDATION ANALYSIS

Using the values set forth above and as contained in the original bankruptcy schedules, in the event of a liquidation, even allowing for commissions in the range of 5% to 6%, all creditors would be paid in full. This analysis has to be tempered with the current dairy environment in which large dairies are simply not selling. The primary reasons are that lenders are unwilling to finance dairies and the prospective buyers are existing dairymen who have lost substantial equity in the last 18 months from a negative cash flow leaving no desire on incentive to expand their dairy operations. The values used by Debtor in the schedules are values in a stabilized milk market with lenders willing to finance a dairyman seeking to expand his

///

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

operations. An empty dairy in the current environment would, in all probability, not pay creditors in full.

## SUMMARY OF THE PLAN

Debtor intends to continue to operate both dairies and to pay its creditors over a reasonable time. Attached hereto as Exhibit A is a budget for an average one month for the dairy with its existing 2,400 milking cows and for the additional income for an additional 1,000 cows that will be purchased from the sale of the quota and from the natural increase from the replacement heifers owned by Debtor. In addition, the budget includes the annual budget for farming and F&A Custom Farming Operations. The budgets include the basis for the calculation of the feeding requirements.

The budget shows a net available for distribution to all creditors. For the Plan to fully fund, the herd must be increased by 1,000 animals. Debtor estimates that it will be able to purchase between 650 and 700 milking cows from the proceeds of the pool quota sale. The additional 300 to 350 cows will be from its heifer replacement program. The payments to the Unsecured Class are increased as the herd increases up to the additional 1,000 cows. Another feature of the budget is that it includes the purchase of "puts" on the commodity exchange to ensure a floor price for the milk. The purchase of these puts will result in at least the minimum payments under the Plan being made. The payment to the Unsecured Class is tied to the milk and commodity prices.

## TREATMENT OF THE CLAIM OF WELLS FARGO

Wells Fargo will receive a fixed payment of $2,000,000.00 per year payable monthly at $166,667.00 on their entire obligation, including the terminated interest swap damage amount. The obligation will bear interest at LIBOR plus 4%. As of February 17, 2010, the monthly LIBOR was 0.23% resulting in an interest rate of 4.23%. This will result in an interest payment of about $70,000.00 per month. $125,000.00 would be applied to principal with the balance to interest with any excess interest accrual to be paid upon maturity of the loan. The monthly payment will come directly from Debtor's account.

///

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

As additional principal payments, Wells Fargo will receive 25% of the value of each gallon of milk produced above 26,350 gallons per day. This number will be calculated using $13.90 per hundred weight times the number of gallons in excess of the 26,350 on the milk check settlement statement.

Wells Fargo will also received to be applied to principal 50% of the increase in the milk price above $13.90. The $13.90 is based on the actual payment per hundred weight shown on the milk check settlement statement. As an example, if the milk price were $14.90, Wells Fargo would receive $.50 for each hundred weight produced during the month.

The entire obligation to Wells Fargo Bank will become all due and payable 18 months from confirmation. Between now and confirmation, Wells Fargo will continue to receive the adequate protection payments currently established in the cash collateral order.

Commencing on May 2, 2010 and continuing on the 2nd day of each and every month thereafter through and including December 2, 2010 (except as set forth below), the Debtor shall pay to the Bank the principal sum of $40,000.00 which shall be applied to the outstanding principal obligations due and owing by the Debtor to the Bank. The Bank shall be permitted to automatically debit the debtor-in-possession account previously established by the Debtor with the Bank, Account No. 4121-991988 ("DIP Account") in order to make these monthly principal payments, subject to the condition that the Bank deliver to the Debtor via mail or facsimile an invoice in the amount of $40,000.00 at least 5 calendar days prior to debiting the DIP Account (the "$40,000 Invoice Notice").

Commencing on the earlier of the following dates and on continuing monthly thereafter as set forth below (any such date, a "Trigger Date"), the Debtor shall pay to the Bank the total monthly principal sum of $125,000.00 which shall be applied to the outstanding principal obligations due and owing by the Debtor to the Bank:

(a)     January 2, 2011 and continuing on the 2nd day of each and every month thereafter;

(b)     The 2nd calendar day of the month following the date of the Bank's receipt of a monthly statement from the Dairy Herd Improvement Association (the "DHIA Statement")

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

which states that the Debtor owns 3,500 or more cows (the "Cow Trigger") (which DHIA Statement shall be delivered to the Bank on the 3rd Thursday of each month or 3 days after receipt by Debtor which shall not be later than the 23rd calendar day of each month;

        (c)    The 7th calendar day of the month in which the Bank's receives a creamery advance statement which states that the Debtor's cows are producing 26,350 average gallons per day (the "Gallon Trigger") (which creamery advance statement shall be delivered to the Bank directly from Saputo Cheese or by Debtor on the 1st and 15th calendar day of each month); and

        (d)    The 21st calendar day of the month in which the Bank receives the creamery advance statements on the 15th calendar day of the month which states a Gallon Trigger has occurred.

        The Bank shall be permitted to automatically debit the DIP Account to make these monthly principal payments, as follows (i), as to a Trigger Date based on the Cow Trigger, the Bank shall be permitted to debit the DIP Account in the amount of $125,000.00 on the 2nd calendar day of the month subject to the condition that the Bank deliver to the Debtor via mail or facsimile an invoice in the amount of $125,000.00 at least 3 calendar days prior to debiting the DIP Account, and (ii) as to a Trigger Date based on a Gallon Trigger, the Bank shall be permitted to debit the DIP Account in the amount of $40,000.00 on the 2nd calendar day of each month upon the Bank's compliance with $40,000 Invoice Notice and to thereafter debit the DIP Account for the additional principal payment of $85,000.00 on the 7th or 21st calendar day of that same month, subject to the condition that the Bank deliver to the Debtor via mail or facsimile an invoice in the amount of $85,000.00 at least 3 calendar days prior to debiting the DIP Account.

        Once a Trigger Date occurs, the Debtor shall be obligated to make monthly principal payments to the Bank of $125,000.00 notwithstanding (i) any decrease in the number of cows owned by the Debtor below 3500 cows, or (ii) any decrease in the average number of gallons per day being produced by the Debtor's cows below 26,350 gallons.

        In addition to the monthly reporting required to be delivered by the Debtor to the Bank as set forth in paragraphs 1 and 3 above, the Debtor will notify the Bank in writing on the 15th day of each calendar month of the number of cows it owns as of the last day of the preceding

1cCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

month and of the average daily gallons being produced by those cows as of the last day of the preceding calendar month.

The entire obligation to Wells Fargo shall mature eighteen months from confirmation. At the end of 18 months, the maturity date can be extended if Wells Fargo receives a principal reduction of $500,000.00 including the "bonus" principal payments from the increase in gallonage and the increase in milk price. If Wells Fargo receives the $500,000.00 and there is no other default, the maturity date will be extended an additional 24 months upon the same terms and conditions. At the end of the 24 month extension, Debtor has two choices. The first choice is that if Wells Fargo has received an additional $1,000,000.00 in principal reduction during the 24 month period, the maturity date will be extended one more year. The $1,000,000.00 includes the two bonus payments based on gallonage and milk price. The second choice is that the Bank will release its lien on the cattle and feed to allow a refinance of the cattle and feed for the sum of $4,000,000.00. This refinance is in lieu of the $1,000,000.00 principal reduction.

The principal reduction by the end of the 24 month extension is estimated to be $6,000,000.00. If the cattle are refinanced for $4,000.00.00, the obligation on the real property will be reduced to less than $10,000,000.00 and Debtor will have one year to refinance the real estate. The junior creditors on the real estate must subordinate to any refinancing.

## TREATMENT OF THE CLAIM OF BM&A RETIREMENT TRUST

BM&A Retirement Trust holds a junior lien to Wells Fargo Bank on all of the real and personal property in the estate securing an obligation of approximately $4,050,000.00. Wells Fargo and BM&A entered into an inter-creditor agreement dated November 10, 2006, which provides in general that upon liquidation of any collateral by BM&A, the proceeds of such a liquidation shall be paid to Wells Fargo. The contractual rate of interest to BM&A is 10%. BM&A under the Plan shall receive interest only payments for 60 months from confirmation at the rate of 5% per annum, payable monthly. The obligation shall continue to accrue interest at the rate of 10% per annum with the accrued but unpaid interest added to the principal. Beginning on the 61st month, interest at the rate of 10% per annum shall be paid monthly through month 120 at which time the entire obligation shall become due and payable.

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

## SECURED CREDITORS JUNIOR TO BM&A RETIREMENT TRUST

J. D. Heiskell has a lien on Dairy No. 1 securing an obligation of approximately $1,149,057.00. Jim Lyman has a lien on Dairy No. 2 securing an obligation of $570,000.00. Stanislaus Farm Supply has lien on Dairy No. 1 securing an obligation of $470,253.27. A. L. Gilbert recorded an abstract of judgment secured by both dairies in the amount of $601,595.00. A. L. Gilbert also claims a dairy supply lien under Food and Agricultural Code §57405(d)(2) which would constitute a lien on Debtor's milk check for 45 days of grain supplied by A. L. Gilbert. The liens on the personal property of Debtor senior to A. L. Gilbert exceed the value of the collateral. For this reason, A. L. Gilbert is treated as a fully claim by the real property. All four junior creditors on the real property shall be amortized over a period of 25 years at 5% interest payable monthly.

## PRIORITY TAXES

Priority taxes according to the schedules total $987,000.00. These claims must be paid within five years of the date of the filing of the case on November 12, 2009, with statutory interest. The claim shall be amortized over the period of months determined by subtracting the number of months from the filing of the case until confirmation from 60, payable monthly, at the statutory interest rate.

## TREATMENT OF THE CLAIMS SECURED BY EQUIPMENT LOANS

There are seventeen loans secured by various items of equipment or vehicles. All are fully secured. Each of the seventeen loans shall be amortized over a period of five years at 7% interest payable monthly beginning at the end of the first full month following confirmation.

## TREATMENT OF THE CLAIMS OF UNSECURED CREDITORS

The unsecured creditors total approximately $3,912,408.00. The unsecured creditors shall accrue interest at the rate of 3% per annum from the date of confirmation and shall be paid pro rata quarterly beginning at the end of the first full calendar quarter following confirmation. The amount available for distribution to the unsecured creditors as shown on the attached budgets on a yearly basis after the increase of the herd by the 1,000 animals is calculated as follows:

IcCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

| | | |
|---|---|---|
| Gross income available for distribution to creditors | | $3,866,000.00 |

Payment to other classes

| | | |
|---|---|---|
| Wells Fargo | $2,000,000.00 | |
| BM&A | 216,000.00 | |
| Priority taxes | 252,000.00 | |
| Junior real property creditors | 196,000.00 | |
| Equipment loans | 197,000.00 | |
| Total: | | 2,861,000.00 |
| Net to Unsecured Class | | $1,005,000.00 |

One fourth of this amount shall be payable quarterly beginning at the end of the first full calendar quarter following confirmation. The amount payable to unsecured creditors shall be increased or decreased according to the following formula. If the milk price for Class III milk received by Debtor exceeds $13.90 per hundred weight in the quarter in which the payment to unsecured creditors is made, the unsecured creditors shall receive 25% of such additional amount for each of the three months during the quarter. As an example, if the average milk price for the quarter were $14.90 and Debtor is producing the volume anticipated after the increase and the herd size by 1,000 cows, the daily milk production would be 26,350 gallons which for each month would produce 67,983 hundred weights for a total of 203,949 hundred weights for the quarter. A $1.00 increase would result in the unsecured class receiving an additional $50,987.00 for the quarter. If the average milk price received by Debtor for the quarter is less than $13.90, the dividend to the Unsecured Class shall be reduced by the difference multiplied by the number of hundred weights produced in the quarter.

Debtor anticipates that an increase in milk price will also be accompanied by an increase in feed prices. The commodity prices having the greatest impact on Debtor feed costs are hay, and rolled corn. The price of these commodities at the time of preparation of the budget were $180.00 per ton each. At the end of each quarter in which a payment is due, the base price shall be compared to the average price paid by Debtor for the quarter for each commodity. The payment to the class shall be either increased or decreased calculated by subtracting the base price from the average price during the quarter times the number of units of each commodity purchased by Debtor during the quarter.

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

The budgets attached to this Disclosure Statement are based on a milking herd of 3,500 cows. By the time the Plan is confirmed, it is anticipated that the pool quota will have been sold with the proceeds used to purchase between 650 and 700 additional cows and there will be an additional increase in the herd size from heifers currently owned of approximately 100 head. For purposes of illustration it is assumed that there will be an increase of 750 of the 1,000 cows required. The 1,000 cow increase resulted in additional per month revenue of $127,200.00 or $127.20 per cow. If the Debtor is short 250 cows at the time of confirmation, the budget will be short 250 times $127.20 or $31,800.00 per month or $95,400.00 per quarter. Payment to the unsecured creditors shall be reduced by $127.20 times the difference between the average of the cows milked during the quarter in which the payment is due subtracted from 3,500. It is anticipated that the number of cows will reached 3,500 within eight months of confirmation.

## **GENERAL PROVISIONS**

### **CERTAIN RISK FACTORS TO BE CONSIDERED**

**HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

Risk of Non-Confirmation of the Plan.

Although the Proponent believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate the resolicitation of votes.

///

<u>Non-Consensual Confirmation.</u>

In the event one or more impaired Classes of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Proponent's request, if all other conditions for confirmation have been met and at least one impaired Class has accepted the Plan (such acceptance being determined without including the vote of any "insider" in such Class) and, as to each impaired Class that has not accepted the plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting impaired classes. The Proponent believes that the Plan satisfies those requirements.

<u>Certain Risks Related to the Plan.</u>

Successful implementation and completion of the Plan are subject to certain risks and uncertainties, including the outcome of the pending and potential litigation.

## **JURISDICTION OF THE COURT**

The Bankruptcy Court shall continue to maintain jurisdiction subsequent to confirmation of the Plan for the purposes of:

1.      Fixing the allowance of any claim and/or re-examination of any claim or interest which has been allowed as of the date of confirmation, including hearing and determination of any objection to a claim.

2.      Correcting any defect, curing any omission, or reconciling any inconsistency in the Plan or the order of confirmation as may be necessary to carry out the intentions and purposes of the Plan.

3.      Confirming a modified Plan after confirmation of the Plan pursuant to § 1127(b) of the code.

4.      Issuing any order necessary to implement the Plan or the order of confirmation, including without limitations such declaratory and injunctive orders as are appropriate to protect the trustee and the Debtors' estate and holders of claims to be paid or otherwise treated under the Plan.

5.      Fixing, approving, and allowing all claims for administrative expenses including all items allowable under §507(a)(1).

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

1         6.     Entering an order concluding and terminating the reorganization case.

2    Dated: March 12, 2010.           McCORMICK, BARSTOW, SHEPPARD

3                                          WAYTE & CARRUTH LLP

4                          By:

5                                  Hilton A. Ryder
                              Attorneys for Debtor

6    Dated: March 12, 2010.

7

8                          /s/ Albert Xavier

9                          Albert Xavier, Trustee
                      of the Frank J Gomes Irrevocable

10                         Family Trust Dated April 9,2003

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   17189/00011-1527912.v1

27

28

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

## Frank J Gomes Dairy
## (1) Month Budget

| Description | Income | Expenses. |
|---|---|---|
| Milk Check | 692,000 | |
| 19,000 Gallons @13.90 | | |
| Cull Cows:51Head @ $600 | 30,600 | |
| Pool Quota Income | 13,500 | |
| | | |
| | | |
| Feed: | | 221,000 |
| Labor: Gross Wages | | 115,000 |
| Labor: Payroll Taxes | | 23,700 |
| Utilities: | | 27,080 |
| PG@E -20,000 | | |
| Propane - 2,300 | | |
| Trash Disposal - 1,180 | | |
| Phone & Mobile - 3,600 | | |
| Minerals | | 16,000 |
| Fuel & Oil | | 20,000 |
| Insurance: | | 33,500 |
| Health - 13,750 | | |
| Liability - 7,417 | | |
| Work Comp - 12,333 | | |
| Medicine | | 27,000 |
| Breeding | | 12,000 |
| Barn Supplies | | 13,800 |
| Testing | | 2,400 |
| Hoof Trim | | 5,000 |
| Animal Disposal | | 1,500 |
| Vet | | 5,000 |
| Repairs @ Maintenance | | 19,000 |
| Misc. | | 5,000 |
| Lease | | 7,120 |
| Accounting & Office | | 2,000 |
| Milk Price Protection @.35 | | 17,500 |
| | | |
| Total | | |
| | 736,100 | 573,600 |

# F and A Farms

| Income | | | $1,050,000.00 |
|---|---|---|---|
| **Out of Budget Expenses** | | | |
| | | | |
| Labor | | ($100,000.00) | |
| Fuel | | ($230,000.00) | |
| Repairs & Maintanence | | ($221,000.00) | |
| Bags | | ($108,000.00) | |
| Licenses | | ($43,000.00) | ($702,000.00) |
| | | | |
| **Subtotal** | | | $348,000.00 |

# Harvesting and Expensing of Farming
## 1000 Acres Approximately

| Acres | Item | Yield | Price in Bag | Total Tons | Total |
|---|---|---|---|---|---|
| 246 | Alfalfa | 24 Ton per Acre | $60.00 | 5,900 | $354,000.00 |
| 613 | Oats | 12 nTon per Acre | $35.00 | 7,300 | $255,500.00 |
| 613 | 1st Corn | 30 Ton per Acre | $45.00 | 18,000 | $810,000.00 |
| 265 | 2nd Corn | 22 Ton per Acre | $40.00 | 5,800 | $232,000.00 |
| 348 | Sudan | 13 Ton per Acre | $35.00 | 4,500 | $157,500.00 |
| | | **Total Value Harvested Crops** | | | **$1,809,000.00** |
| | | **Alfalfa** | | | |
| **Acres** | **Item** | **Cost** | **Total** | | |
| 246 | Prowl | $50.00 | $12,300.00 | | |
| 246 | Weeds | $10.00 | $2,460.00 | | |
| 246 | Weevils | $10.00 | $2,460.00 | | |
| 246 | Fertilizers | $56.00 | $13,776.00 | | |
| 246 | Worms | $16.00 | $3,936.00 | | |
| 246 | Apply | $50.00 | $12,300.00 | | |
| | | **Oats** | | | |
| 613 | Seed | $38.00 | $23,294.00 | | |
| | | **Sudan** | | | |
| 348 | Seed | $60.00 | $20,880.00 | | |
| | | **Corn 1st** | | | |
| 613 | Seed | $72.00 | $44,136.00 | | |
| 613 | Fertilizer | $150.00 | $91,950.00 | | |
| 613 | Heericide | $40.00 | $24,520.00 | | |
| 613 | Apply | $50.00 | $30,650.00 | | |
| | | **Corn 2nd** | | | |
| 265 | Seed | $72.00 | $19,080.00 | | |
| 265 | Fertilizer | $64.00 | $16,960.00 | | |
| **Bulk Gypsum** | | | | | |
| 400 Tons @ 40 Acre | | | $16,000.00 | | |
| **CCID Water** | | | $16,000.00 | | |
| **Total Farming Expense** | | | **$350,702.00** | | **$1,458,298.00** |

# Annual Usage of Feed on 19,000 Gallons

| | Month | Year |
|---|---|---|
| Milk Hay | 130 | 1,560 |
| Dry Hay | 92 | 1,104 |
| Corn Silage | 1457 | 17,484 |
| Oat Silage | 849 | 10,188 |
| Haylage | 468 | 5,616 |
| Straw | 24 | 288 |
| | | |
| | | |
| Corn | 508 | 6,096 |
| Seed | 65 | 780 |
| Gluten | 326 | 3,912 |
| Soy | 171 | 2,052 |

# Feed Needs vs Farming Analysis

| | | | |
|---|---|---|---|
| | Milk Hay | 1560 @ 120 | (187,200.00) |
| | Dry Hay | 1100 @ 100 | (110,000.00) |
| Sell | Corn Silage | 6300 @ 45 | 283,500.00 |
| Sell | Oat Silage | 1600 @ 35 | 56,000.00 |
| Sell | Haylage | 300 @ 60 | 18,000.00 |
| | Straw | 288 @ 65 | (18,700.00) |
| | | | |
| | | **Surplus** | **41,600.00** |

# Daily and Monthly Feed Totals

## Milk Cows: 2,100 Head

| | Day | Day Total | Month Total | Month Total | Cost |
|---|---|---|---|---|---|
| Hay | 4# | 8,400 | 260,400 | 130 Tons | 15,600 |
| Gluten | 10# | 21,000 | 651,000 | 326 Tons | 51,500 |
| Seed | 2# | 4,200 | 130,200 | 65 Tons | 17,000 |
| Amino | 2# | 4,200 | 130,200 | 65 Tons | 27,000 |
| Minerals | 2# | 4,200 | 130,200 | 65 Tons | 14,400 |
| Soy | 4# | 8,400 | 260,400 | 130 Tons | 46,200 |
| Corn | 13.5# | 28,350 | 878,850 | 440 Tons | 81,300 |
| Haylage | 12# | 25,200 | 781,200 | 390 Tons | 23,500 |
| Corn Silage | 40# | 84,000 | 2,604,000 | 1302 Tons | 58,600 |
| | | | | | 335,100 |

## Dry Cows: 400 Head

| | Day | Day Total | Month Total | Month Total | Cost |
|---|---|---|---|---|---|
| Straw | 1# | 400 | 12,400 | 6.2 Tons | 500 |
| Alfalfa | 1# | 400 | 12,400 | 6.2 Tons | 500 |
| Oat Silage | 24# | 9,600 | 297,600 | 149 Tons | 5,300 |
| Haylage | 4# | 1,600 | 49,600 | 25 Tons | 1,500 |
| Corn Silage | 25# | 10,000 | 310,000 | 155 Tons | 7,000 |
| Whey | 17# | 6,800 | 210,800 | 105 Tons | 0 |
| | | | | | 14,800 |

## 0-6 Months Heifers   (870 Head)

| | Day | Day Total | Month Total | Month Total | Cost |
|---|---|---|---|---|---|
| R1200 | .25# | 218 | 6,760 | 3.4 Tons | 900 |
| Alfalfa | 5# | 4,350 | 134,850 | 68 Tons | 8,200 |
| Dry Whey | .6# | 522 | 16,200 | 8 Tons | 5,600 |
| Soy | 3# | 2,610 | 80,910 | 41 Tons | 14,600 |
| Corn | 5# | 4,350 | 134,850 | 68 Tons | 12,580 |
| | | | | | 41,880 |

## Older Heifers   (1130 Head)

| | Day | Day Total | Month Total | Month Total | Cost |
|---|---|---|---|---|---|
| Straw | 1# | 1,130 | 35,030 | 18 Tons | 1,200 |
| Alfalfa | 1# | 1,130 | 35,030 | 18 Tons | 1,200 |
| Oat Silage | 40# | 45,200 | 1,401,200 | 700 Tons | 24,500 |
| Haylage | 3# | 3,390 | 105,090 | 53 Tons | 3,200 |
| Whey | 17# | 19,210 | 595,510 | 298 Tons | 0 |
| | | | | | 30,100 |

| 1,000 Cows | | | |
|---|---|---|---|
| **Income:** | | | |
| Milk 840 @ 8.75 Gallons = 7,350 Gallons | | | |
| 22,417 cwts @ 13.90 | | $311,000 | |
| Cull 17 Head @ $600 | | $10,200 | |
| Income Loss:Quota | | ($13,500) | |
| | | $307,700 | |
| | | | |
| | | | |
| **Expenses:** | | | |
| 840 Head @ 5.15 per day | | $132,000 | |
| 160 Head @ 1.19 per day | | $5,800 | |
| Labor (2 Men) | | $6,000 | |
| Utilities | | $500 | |
| Minerals | | $6,400 | |
| Fuel & Oil | | $500 | |
| Insurance | | $0 | |
| Medicine | | $10,800 | |
| Breeding | | $4,800 | |
| Barn Supplies | | $1,000 | |
| Testing | | $800 | |
| Hoof Trim | | $2,000 | |
| Animal Disposal | | $0 | |
| Vet | | $0 | |
| Repairs & Maintenance | | $1,000 | |
| Misc. | | $800 | |
| Price Protection @ .35 cwt | | $8,100 | |
| | | $180,500 | |
| | | | |
| | Net | $127,200 | |