FILED

June 08, 2010

CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA

0002690760

1  Hilton A. Ryder, # 54470
   McCormick, Barstow, Sheppard
2  Wayte & Carruth LLP
   P.O. Box 28912
3  5 River Park Place East
   Fresno, CA 93720-1501
4  Telephone:    (559) 433-1300
   Facsimile:    (559) 433-2300
5
6  Attorneys for Debtor

(SPACE BELOW FOR FILING STAMP ONLY)

7

8              UNITED STATES BANKRUPTCY COURT

9              EASTERN DISTRICT OF CALIFORNIA

10                      Fresno Division

11  In Re                          Case No. 09-61024-A-11

12  FRANK J. GOMES DAIRY,          Chapter Number: 11
    a California Limited Partnership,
13                                 Docket Control #HAR-5

                Debtor.
14                                 Dept:    A, Courtroom 11
                                   Judge:   Honorable Whitney Rimel
15

16              **AMENDED DISCLOSURE STATEMENT**
                   **(for Hearing on June 23, 2010)**
17

18          Frank J. Gomes Dairy, Debtor and Debtor-in-Possession, (hereinafter "Debtor")

19  voluntarily filed the above-captioned case on November 12, 2009, for a reorganization pursuant

20  to Chapter 11 of Title 11, United States Code, with the United States Bankruptcy Court for the

21  Eastern District of California.

22          Debtor has prepared and filed this Amended Disclosure Statement (hereinafter

23  "Disclosure Statement") for the Court's approval with respect to the Debtor, his business, debts

24  and assets.

25          The purpose of this Amended Disclosure Statement is to provide the holders of

26  claims against the Debtor or interest in the Debtor's property with adequate information about the

27  Debtor's business affairs to make an informed judgment as to the merits of accepting or rejecting

28  the Debtor's proposed Amended Plan of Reorganization (hereinafter "Plan").

The material herein contained is intended solely for the purpose of providing known creditors of the Debtor with adequate information to evaluate the merits of the proposed Plan, and for no other purpose or use.

This is the second Disclosure Statement that has been submitted by the Debtor to the Court during this case.

The Debtor has also filed the Plan with the Court, which said Plan is summarized herein. The material contained herein concerning alternatives to the Plan proposed by the Debtors is limited by both practical considerations of space and are the opinions of the Debtor regarding the same.

In order for the Plan to be accepted by creditors and confirmed by the Court, a majority in number and a two-thirds majority in amount of claims filed and allowed (for voting purposes) and voting in an impaired class must vote to accept the Plan. Assuming this Disclosure Statement is approved by the Court as containing "adequate information," you will be notified as to the procedurally correct way to cast your ballot for acceptance or rejection. If the proposed Plan is not confirmed, the Debtor or other parties-in-interest may propose an alternate Plan or the case may be dismissed or converted to one under Chapter 7.

No representations concerning the Debtor or the Plan are authorized by the Debtor other than set forth in this Disclosure Statement.

## HISTORY OF BUSINESS

Debtor is a limited partnership. The general partner is the Frank J. Gomes Irrevocable Family Trust Dated April 9, 2003, which trust holds a 1% general partnership interest. The Trustee of the Trust is Albert Xavier. The same trust is also a 49% limited partner. The other 50% limited partner is the Frank J. Gomes Separate Trust Dated June 2, 2003. Frank J. Gomes is the Trustee. As the Trustee of the general partner, Albert Xavier is the person authorized to act on behalf of the Debtor-in-Possession and the Reorganized Debtor.

Debtor operates two dairies. Dairy No. 1 consists of 365 acres at 5301 N. DeAngelis Road, Stevinson, California. Dairy No. 2 consist of 459 acres located at 870 Kniebes Road, Gustine California. The two dairies ("Dairy") are operated as a single entity. The Dairy

milks approximately 2,700 cows with an additional 350 dry cows. The Dairy maintains a replacement program and has 2,500 heifers ranging in the age from day old to mature springers.

The only asset of the Frank J. Gomes Separate Trust Dated June 2, 2003, is its limited partnership interest in the Dairy. The only asset in the Frank J. Gomes Irrevocable Family Trust Dated April 9, 2003, is the trust's general and limited partnership interest in the Debtor, except that this trust also owns a 112 acre parcel contiguous to Dairy No. 2 rented and farmed by Debtor. The purchase price of the 112 acres in 2005 was financed by Wells Fargo Bank through a loan to the Debtor that in turn loaned to the trust. The initial balance on the obligation of the Trust to Debtor was $1,688,057.00 accruing interest at the rate Debtor was charged by Wells Fargo. The 112 acres is additional collateral for the Wells Fargo real estate loan plus the debt to BM&A Retirement Trust plus the debt to Jim Lyman of about $500,000.00.

Debtor is as vertically integrated as possible for a dairy. Debtor owns all of the farming and harvesting equipment necessary to farm over 1,000 acres and in addition, performs harvesting and custom farming work for neighbors under the fictitious name, F&A Farms. Debtor owns its trucks and trailers to haul its milk to the creamery and owns trucks and trailers to transport commodities. The historically low milk prices in 2009 resulted in operating losses of between $1.00 and $2.00 per day per cow.

The Debtor farms 211 leased acres and approximately 800 acres in Dairy No. 1 and Dairy No. 2 for a total of approximately 1,000 acres. Currently 220 acres are planted to alfalfa. The balance is planted to corn. At the time the case was filed, the Debtor had on hand approximately 1,500 tons of hay and 41,000 tons of silage. Debtor must purchase grain and other commodities in addition to feeding the hay and silage on hand.

The Debtor delivers its milk to Saputo Cheese USA, Inc. A. L. Gilbert, Inc. levied on the milk check which resulted in the filing of the Chapter 11.

## EVENTS DURING CHAPTER 11

Debtor filed a Motion for Use of Cash Collateral that was granted allowing the continued operation of the Debtor. Any secured creditors whose cash collateral was used were granted a replacement lien in like collateral to the extent of the use of the cash collateral. The

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

3

three creditors with replacement liens are Wells Fargo Bank, BM&A Retirement Trust ("BM&A") and the claim of A. L. Gilbert. Adequate protection payments are being made to Wells Fargo Bank under the order authorizing the use of cash collateral.

Debtor began making adequate protection payments, consisting of the monthly contractual payment, to most of its secured creditors with liens on equipment beginning January 15, 2010, in order to avoid any motions for relief from stay. Only Ford Motor Credit filed a motion. The collateral of these other secured creditors consists generally of items of equipment.

Debtor has been working closely with its major secured creditors, Wells Fargo Bank and BM&A Retirement Trust to not only negotiate the order for use of cash collateral but also to reach acceptable terms for a plan of reorganization. The results of those negotiations are contained in the Plan subject to final approval of each creditor. Part of the negotiations also resulted in the sale of Debtor's milk pool quota with net proceeds estimated to be $980,000.00. All of the proceeds were used to purchase additional milking cows or springers to increase Debtor's cash flow necessary to meet the requirements of the Plan.

An Unsecured Creditors Committee has been appointed in this case and is represented by attorney Peter Fear.

## SUMMARY OF ASSETS

Dairy No. 1 consists of 365 acres at 5301 N. DeAngelis Road, Stevinson, California and has a value in the opinion of Debtor based on the latest Wells Fargo appraisal of $8,400,000.00. It is encumbered by a first deed of trust held by Wells Fargo Bank securing an obligation of about $14,000,000.00 which also encumbers Dairy No. 2 and the additional 112 acres owned by the general partner of Debtor. BM&A Retirement Trust holds a second deed of trust on Dairy No. 1 and Dairy No. 2 securing an obligation of approximately $4,050,000.00 which obligation is also secured by the personal property of Debtor. J.D. Heiskell holds a third a deed of trust on Dairy No. 1 securing an obligation at the time of filing of $1,149,057.65. Stanislaus Farm Supply holds a fourth deed of trust on Dairy No. 1 securing an obligation of $470,253.27.

///

1cCormick, Barstow,
Sheppard, Wayte &
Carruth LLP
5 River Park Place East
Fresno, CA 93720-1501

Dairy No. 2 consists of 459 acres at 870 Kniebes Road, Gustine, California that has a value in the opinion of Debtor based on the latest Wells Fargo appraisal of $13,800,000.00. Dairy No. 2 is encumbered by a first deed of trust held by Wells Fargo and a second deed of trust held by BM&A Retirement Trust securing the same obligation as Dairy No. 1. Jim Lyman holds a third deed of trust on Dairy No. 2 and the 112 acres securing the balance of $570,000.00. A. L. Gilbert recorded an abstract of judgment which would attach to both Dairy No. 1 and Dairy No. 2 securing an obligation of $601,595.00.

Debtor leases the 112 acres of open ground from Debtor's general partner and pays the real property taxes. The property is necessary for adequate acreage for the number of permitted cows on Dairy No. 2. Debtor also leases 48 acres of open ground from Myers Family Farms at $184.00 per acre, 50 acres of open ground from Lewis Bambauer for $200.00 per acre plus a home for employees for $550.00 per month.

Debtor also operates a custom harvest and farming operation under the fictitious name of F&A Farms. Debtor has farming and harvesting equipment sufficient to farm or harvest all of its crops and generate significant additional income as more fully set forth in the attached budgets. Accounts receivable are routinely created and collected with an average at any one time of approximately $300,000.00.

The personal property assets of Debtor at the time the case was filed are generally described as follows with values shown in the opinion of Debtor based on the latest pre-petition Wells Fargo appraisal.

| DESCRIPTION | AMOUNT |
|---|---|
| Accounts Receivable – F&A Farms | $   330,000.00 |
| Milk Check | 787,000.00 |
| Automobiles, Trucks and Trailers | 490,842.00 |
| Office Equipment | 5,000.00 |
| Hay Inventory | 225,000.00 |
| Silage Inventory | 2,665,000.00 |
| Livestock | 5,275,460.00 |
| Sudan Silage – net of harvest | 86,625.00 |
| 265 acres of corn silage – net of harvest | 262,350.00 |
| Farming equipment | 1,427,000.00 |
| Pool Quota | 859,000.00 |
| **Total** | **$12,413,277.00** |

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

# SUMMARY OF LIABILITIES

The obligations secured by real property are described above. Wells Fargo Bank holds a first security interest in the personal property of Debtor other than the vehicles securing an obligation at the time of filing of approximately $6,000,000.00.

BM&A holds a security interest junior to Wells Fargo on the same collateral securing an obligation of approximately $4,050,000.00 at the time of filing.

There are seventeen loans secured by individual items of equipment. The value of the collateral is equal to or greater than the outstanding balance on each loan. All of these items of equipment are retained under the Plan and the obligations are restructured, except a Case Swather, which will be surrendered.

The priority taxes listed in the original schedules total $987,450.00. These consist of payroll taxes due the Employment Development Department for 2009 of approximately $60,000.00 with the Internal Revenue Service Form 943 taxes for the period of 2003 through 2009 totaling $916,468.86 as set forth in Claim 51.

The unsecured creditors listed in the original schedules total $3,912,408.62. A review of the claims filed are generally consistent with the amount listed in the original schedules, except Frank Gomes has filed an unsecured claim for $1,100,000.00 which is disputed. An objection will be filed.

Cost of Administration Claims are being paid as agreed. Professional fees through confirmation in excess of retainers received are $30,000.00 for the attorney for Debtor, $20,000.00 for Ray Sheets, CPA, and $20,000.00 for the Attorney for the Creditors' Committee.

A summary of the assets and liabilities described and as set forth in the original filed schedules show assets totaling $34,613,277.00 and liabilities totaling $30,930,195.00. The secured obligation to Wells Fargo on the real property has increased by approximately $1,500,000.00 as a result of Debtor's default on an interest swap agreement, however, Debtor remains solvent utilizing the values in the original schedules.

///

///

IcCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

## LIQUIDATION ANALYSIS

Using the values set forth above and as contained in the original bankruptcy schedules, in the event of a liquidation, even allowing for commissions in the range of 5% to 6%, all creditors would be paid in full. This analysis has to be tempered with the current dairy environment in which large dairies are simply not selling. The primary reasons are that lenders are unwilling to finance dairies and the prospective buyers are existing dairymen who have lost substantial equity in the last 18 months from a negative cash flow, leaving no desire on incentive to expand their dairy operations. The values used by Debtor in the schedules are values in a stabilized milk market with lenders willing to finance a dairyman seeking to expand his operations. An empty dairy in the current environment would, in all probability, not pay creditors in full.

## SUMMARY OF THE PLAN

Debtor intends to continue to operate both dairies and to pay its creditors over a reasonable time. Attached hereto as Exhibit A is a budget for an average one month for the dairy with its existing 2,400 milking cows and for the additional income for an additional 1,000 cows some of which were purchased from the sale of the quota. In addition, the budget includes the annual budget for farming and F&A Custom Farming Operations. The budgets include the basis for the calculation of the feeding requirements.

The budget shows a net available for distribution to all creditors. For the Plan to fully fund, the herd must be increased by 1,000 animals. Debtor was able to purchase 800 milking cows and springers from the proceeds of the pool quota sale. The additional 200 cows will be from its heifer replacement program. The payments to the Unsecured Class are increased as the herd increases up to the additional 1,000 cows. Another feature of the budget is that it includes the purchase of "puts" on the commodity exchange to ensure a floor price for the milk. The purchase of these puts will result in at least the minimum payments under the Plan being made. The payment to the Unsecured Class is tied to the milk and commodity prices. There are no tax consequences under the Plan because Debtor is a partnership and does not pay income taxes.

IcCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PLACE PLACE EAST
FRESNO, CA 93720-1501

## TREATMENT OF THE CLAIM OF WELLS FARGO

The treatment of the claim of Wells Fargo is contained in Exhibit B.

## TREATMENT OF THE CLAIM OF BM&A RETIREMENT TRUST

BM&A Retirement Trust holds a junior lien to Wells Fargo Bank on all of the real and personal property in the estate securing an obligation of approximately $4,050,000.00. Wells Fargo and BM&A entered into an inter-creditor agreement dated November 10, 2006, which provides in general that upon liquidation of any collateral by BM&A, the proceeds of such a liquidation shall be paid to Wells Fargo. The contractual rate of interest to BM&A is 10%. BM&A under the Plan shall receive interest only payments for 120 months from confirmation at the rate of 10% per annum, payable monthly all due and payable 120 months from confirmation.

## SECURED CREDITORS JUNIOR TO BM&A RETIREMENT TRUST

J. D. Heiskell has a lien on Dairy No. 1 securing an obligation of approximately $1,149,057.00. Jim Lyman has a lien on Dairy No. 2 and the 112 acres leased by Debtor securing an obligation of $570,000.00. Stanislaus Farm Supply has lien on Dairy No. 1 securing an obligation of $470,253.27. A. L. Gilbert recorded an abstract of judgment secured by both dairies in the amount of $601,595.00. A. L. Gilbert also claims a dairy supply lien under Food and Agricultural Code §57405(d)(2) which would constitute a lien on Debtor's milk check for 45 days of grain supplied by A. L. Gilbert. The liens on the personal property of Debtor senior to A. L. Gilbert exceed the value of the collateral. For this reason, A. L. Gilbert is treated as a fully secured claim by the real property. All four junior creditors on the real property shall be amortized over a period of 25 years at 5% interest payable monthly all due and payable 7 years from the Effective Date.

## PRIORITY TAXES

Priority taxes according to the schedules total $987,000.00. These claims must be paid within five years of the date of the filing of the case on November 12, 2009, with statutory interest. The claim shall be amortized over the period of months determined by subtracting the

///

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

number of months from the filing of the case until confirmation from 60, payable monthly, at the statutory interest rate.

### TREATMENT OF THE CLAIMS SECURED BY EQUIPMENT LOANS

There are seventeen loans secured by various items of equipment or vehicles. All are fully secured. Each of the seventeen loans shall be amortized over a period between one and five years at 7% interest payable monthly beginning at the end of the first full month following confirmation. The Treatment of the 8 claims of Wells Fargo Equipment Finance is set forth in Exhibit C.

### TREATMENT OF THE CLAIMS OF UNSECURED CREDITORS

The unsecured creditors total approximately $3,912,408.00. The claim of the unsecured creditors shall be paid in full and shall accrue interest at the rate of 3% per annum from the date of confirmation all due December 31, 2017. Dividends shall be paid pro rata quarterly beginning at the end of the first full calendar quarter following confirmation. The minimum quarterly distribution shall be the interest accrual for the quarter  The amount available for distribution to the unsecured creditors as shown on the attached budgets on a yearly basis after the increase of the herd by the 1,000 animals is calculated as follows:

Gross income available for distribution to creditors $3,866,000.00

Payment to other classes
| | | |
|---|---|---|
| Wells Fargo | $2,000,000.00 | |
| BM&A | 432,000.00 | |
| Priority taxes | 252,000.00 | |
| Junior real property creditors | 196,000.00 | |
| Equipment loans | 197,000.00 | |
| Total: | | 3,077,000.00 |
| Net to Unsecured Class | | $ 789,000.00 |

One fourth of this amount shall be payable quarterly beginning at the end of the first full calendar quarter following confirmation. The amount payable to unsecured creditors shall be increased or decreased according to the following formula. If the milk price for  over base milk received by Debtor exceeds $13.90 per hundred weight in the quarter in which the payment to unsecured creditors is made, the unsecured creditors shall receive 25% of such additional amount for each of

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

the three months during the quarter. As an example, if the average milk price for the quarter were $14.90 and Debtor is producing the volume anticipated after the increase and the herd size by 1,000 cows, the daily milk production would be 26,350 gallons which for each month would produce 67,983 hundred weights for a total of 203,949 hundred weights for the quarter. A $1.00 increase would result in the unsecured class receiving an additional $50,987.00 for the quarter. If the average milk price received by Debtor for the quarter is less than $13.90, the dividend to the Unsecured Class shall be reduced by the difference multiplied by the number of hundred weights produced in the quarter.

Debtor anticipates that an increase in milk price will also be accompanied by an increase in feed prices. The commodity prices having the greatest impact on Debtor feed costs are hay, and rolled corn. The price of these commodities at the time of preparation of the budget were $180.00 per ton each. At the end of each quarter in which a payment is due, the base price shall be compared to the average price paid by Debtor for the quarter for each commodity. The payment to the class shall be either increased or decreased calculated by subtracting the base price from the average price during the quarter times the number of units of each commodity purchased by Debtor during the quarter.

The budgets attached to this Disclosure Statement are based on a milking herd of 3,500 cows. The 1,000 cow increase will result in additional per month revenue of $127,200.00 or $127.20 per cow. If the Debtor has less than 3,500 cows at the time of confirmation. The payment to the unsecured creditors shall be reduced by $127.20 times the difference between the average of the cows milked during the quarter in which the payment is due subtracted from 3,500. It is anticipated that the number of cows will reached 3,500 within eight months of confirmation.

## GENERAL PROVISIONS

## CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR**

McCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

**INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

<u>Risk of Non-Confirmation of the Plan</u>.

Although the Proponent believes that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no assurance that modifications to the Plan will not be required for confirmation, or that such modifications would not necessitate the resolicitation of votes.

<u>Non-Consensual Confirmation</u>.

In the event one or more impaired Classes of Claims does not accept the Plan, the Bankruptcy Court may nevertheless confirm the Plan at the Proponent's request, if all other conditions for confirmation have been met and at least one impaired Class has accepted the Plan (such acceptance being determined without including the vote of any "insider" in such Class) and, as to each impaired Class that has not accepted the plan, if the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the rejecting impaired classes. The Proponent believes that the Plan satisfies those requirements.

<u>Certain Risks Related to the Plan</u>.

Successful implementation and completion of the Plan are subject to certain risks and uncertainties, including the outcome of the pending and potential litigation.

## JURISDICTION OF THE COURT

The Bankruptcy Court shall continue to maintain jurisdiction subsequent to confirmation of the Plan for the purposes of:

1.      Fixing the allowance of any claim and/or re-examination of any claim or interest which has been allowed as of the date of confirmation, including hearing and determination of any objection to a claim.

///

1cCORMICK, BARSTOW, SHEPPARD, WAYTE & CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

2.   Correcting any defect, curing any omission, or reconciling any inconsistency in the Plan or the order of confirmation as may be necessary to carry out the intentions and purposes of the Plan.

3.   Confirming a modified Plan after confirmation of the Plan pursuant to § 1127(b) of the code.

4.   Issuing any order necessary to implement the Plan or the order of confirmation, including without limitations such declaratory and injunctive orders as are appropriate to protect the trustee and the Debtors' estate and holders of claims to be paid or otherwise treated under the Plan.

5.   Fixing, approving, and allowing all claims for administrative expenses including all items allowable under §507(a)(1).

6.   Entering an order concluding and terminating the reorganization case.

Dated: June  8 , 2010.

McCORMICK, BARSTOW, SHEPPARD
WAYTE & CARRUTH LLP

By: _____
            Hilton A. Ryder
            Attorneys for Debtor

Dated: June  8 , 2010.


            /s/ Albert Xavier
     _____
            Albert Xavier, Trustee
            of the Frank J Gomes Irrevocable
            Family Trust Dated April 9,2003

17189/00011-1572905.v1

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA  93720-1501

EXHIBIT "A" Page 1 of 8

## Frank J Gomes Dairy
## (1) Month Budget

| Description | Income | Expenses. |
|---|---|---|
| Milk Check | 692,000 | |
| 19,000 Gallons @13.90 | | |
| Cull Cows:51Head @ $600 | 30,600 | |
| Pool Quota Income | 13,500 | |
| | | |
| | | |
| Feed: | | 221,000 |
| Labor: Gross Wages | | 115,000 |
| Labor: Payroll Taxes | | 23,700 |
| Utilities: | | 27,080 |
|   PG@E -20,000 | | |
|   Propane - 2,300 | | |
|   Trash Disposal - 1,180 | | |
|   Phone & Mobile - 3,600 | | |
| Minerals | | 16,000 |
| Fuel & Oil | | 20,000 |
| Insurance: | | 33,500 |
|   Health - 13,750 | | |
|   Liability - 7,417 | | |
|   Work Comp - 12,333 | | |
| Medicine | | 27,000 |
| Breeding | | 12,000 |
| Barn Supplies | | 13,800 |
| Testing | | 2,400 |
| Hoof Trim | | 5,000 |
| Animal Disposal | | 1,500 |
| Vet | | 5,000 |
| Repairs @ Maintenance | | 19,000 |
| Misc. | | 5,000 |
| Lease | | 7,120 |
| Accounting & Office | | 2,000 |
| Milk Price Protection @.35 | | 17,500 |
| | | |
| Total | | |
| | 736,100 | 573,600 |

**F and A Farms**

| | | | |
|---|---|---|---|
| Income | | | $1,050,000.00 |
| | | | |
| Out of Budget Expenses | | | |
| | | | |
| Labor | | ($100,000.00) | |
| Fuel | | ($230,000.00) | |
| Repairs & Maintanence | | ($221,000.00) | |
| Bags | | ($108,000.00) | |
| Licenses | | ($43,000.00) | ($702,000.00) |
| | | | |
| | | | |
| Subtotal | | | $348,000.00 |

# Harvesting and Expensing of Farming
## 1000 Acres Approximately

| Acres | Item | Yield | Price in Bag | Total Tons | Total |
|---|---|---|---|---|---|
| 246 | Alfalfa | 24 Ton per Acre | $60.00 | 6,900 | $354,000.00 |
| 613 | Oats | 12 Ton per Acre | $35.00 | 7,300 | $255,500.00 |
| 613 | 1st Corn | 30 Ton per Acre | $45.00 | 18,000 | $810,000.00 |
| 265 | 2nd Corn | 22 Ton per Acre | $40.00 | 5,800 | $232,000.00 |
| 348 | Sudan | 13 Ton per Acre | $35.00 | 4,500 | $157,500.00 |
| | | | | | |
| | | Total Value Harvested Crops | | | $1,809,000.00 |

| | | Alfalfa | | |
|---|---|---|---|---|
| Acres | Item | Cost | Total | |
| | | | | |
| 246 | Prowl | $50.00 | $12,300.00 | |
| 246 | Weeds | $10.00 | $2,460.00 | |
| 246 | Weevils | $10.00 | $2,460.00 | |
| 246 | Fertilizers | $56.00 | $13,776.00 | |
| 246 | Worms | $16.00 | $3,936.00 | |
| 246 | Apply | $50.00 | $12,300.00 | |
| | | | | |
| | | Oats | | |
| 613 | Seed | $38.00 | $23,294.00 | |
| | | | | |
| | | Sudan | | |
| 348 | Seed | $60.00 | $20,880.00 | |
| | | | | |
| | | Corn 1st | | |
| 613 | Seed | $72.00 | $44,136.00 | |
| 613 | Fertilizer | $150.00 | $91,950.00 | |
| 613 | Heericide | $40.00 | $24,520.00 | |
| 613 | Apply | $50.00 | $30,650.00 | |
| | | | | |
| | | Corn 2nd | | |
| 265 | Seed | $72.00 | $19,080.00 | |
| 265 | Fertilizer | $64.00 | $16,960.00 | |
| | | | | |
| Bulk Gypsum | | | | |
| 400 Tons @ 40 Acre | | | $16,000.00 | |
| | | | | |
| CCID Water | | | $16,000.00 | |
| | | | | |
| Total Farming Expense | | $350,702.00 | | $1,458,298.00 |

| | Month | Year |
|---|---|---|
| Milk Hay | 130 | 1,560 |
| Dry Hay | 92 | 1,104 |
| Corn Silage | 1457 | 17,484 |
| Oat Silage | 849 | 10,188 |
| Haylage | 468 | 5,616 |
| Straw | 24 | 288 |
| | | |
| Corn | 508 | 6,096 |
| Seed | 65 | 780 |
| Gluten | 326 | 3,912 |
| Soy | 171 | 2,052 |

| | | | |
|------|-------------|-------------|--------------|
| | Milk Hay | 1560 @ 120 | (187,200.00) |
| | Dry Hay | 1100 @ 100 | (110,000.00) |
| Sell | Corn Silage | 6300 @ 45 | 283,500.00 |
| Sell | Oat Silage | 1600 @ 35 | 56,000.00 |
| Sell | Haylage | 300 @ 60 | 18,000.00 |
| | Straw | 288 @ 65 | (18,700.00) |
| | | | |
| | | **Surplus** | **41,600.00** |

# Daily and Monthly Feed Totals

## Milk Cows: 2,100 Head

| | Day | Day Total | Month Total | Month Total | Cost |
|---|---|---|---|---|---|
| Hay | 4# | 8,400 | 260,400 | 130 Tons | 15,600 |
| Gluten | 10# | 21,000 | 651,000 | 326 Tons | 51,500 |
| Seed | 2# | 4,200 | 130,200 | 65 Tons | 17,000 |
| Amino | 2# | 4,200 | 130,200 | 65 Tons | 27,000 |
| Minerals | 2# | 4,200 | 130,200 | 65 Tons | 14,400 |
| Soy | 4# | 8,400 | 260,400 | 130 Tons | 46,200 |
| Corn | 13.5# | 28,350 | 878,850 | 440 Tons | 81,300 |
| Haylage | 12# | 25,200 | 781,200 | 390 Tons | 23,500 |
| Corn Silage | 40# | 84,000 | 2,604,000 | 1302 Tons | 58,600 |
| | | | | | 335,100 |

## Dry Cows: 400 Head

| | | | | | |
|---|---|---|---|---|---|
| Straw | 1# | 400 | 12,400 | 6.2 Tons | 500 |
| Alfalfa | 1# | 400 | 12,400 | 6.2 Tons | 500 |
| Oat Silage | 24# | 9,600 | 297,600 | 149 Tons | 5,300 |
| Haylage | 4# | 1,600 | 49,600 | 25 Tons | 1,500 |
| Corn Silage | 25# | 10,000 | 310,000 | 155 Tons | 7,000 |
| Whey | 17# | 6,800 | 210,800 | 105 Tons | 0 |
| | | | | | 14,800 |

## 0-6 Months Heifers   (870 Head)

| | | | | | |
|---|---|---|---|---|---|
| R1200 | .25# | 218 | 6,760 | 3.4 Tons | 900 |
| Alfalfa | 5# | 4,350 | 134,850 | 68 Tons | 8,200 |
| Dry Whey | .6# | 522 | 16,200 | 8 Tons | 5,600 |
| Soy | 3# | 2,610 | 80,910 | 41 Tons | 14,600 |
| Corn | 5# | 4,350 | 134,850 | 68 Tons | 12,580 |
| | | | | | 41,880 |

## Older Heifers   (1130 Head)

| | | | | | |
|---|---|---|---|---|---|
| Straw | 1# | 1,130 | 35,030 | 18 Tons | 1,200 |
| Alfalfa | 1# | 1,130 | 35,030 | 18 Tons | 1,200 |
| Oat Silage | 40# | 45,200 | 1,401,200 | 700 Tons | 24,600 |
| Haylage | 3# | 3,390 | 105,090 | 53 Tons | 3,200 |
| Whey | 17# | 19,210 | 595,510 | 298 Tons | 0 |
| | | | | | 30,100 |

| 1,000 Cows | | | |
|---|---|---|---|
| **Income:** | | | |
| Milk 840 @ 8.75 Gallons = 7,350 Gallons | | | |
| 22,417 cwts @ 13.90 | $311,000 | | |
| Cull 17 Head @ $600 | $10,200 | | |
| Income Loss:Quota | ($13,500) | | |
| | $307,700 | | |
| | | | |
| | | | |
| **Expenses:** | | | |
| 840 Head @ 5.15 per day | $132,000 | | |
| 160 Head @ 1.19 per day | $5,800 | | |
| Labor (2 Men) | $6,000 | | |
| Utilities | $500 | | |
| Minerals | $6,400 | | |
| Fuel & Oil | $500 | | |
| Insurance | $0 | | |
| Medicine | $10,800 | | |
| Breeding | $4,800 | | |
| Barn Supplies | $1,000 | | |
| Testing | $800 | | |
| Hoof Trim | $2,000 | | |
| Animal Disposal | $0 | | |
| Vet | $0 | | |
| Repairs & Maintenance | $1,000 | | |
| Misc. | $800 | | |
| Price Protection @ .35 cwt | $8,100 | | |
| | $180,500 | | |
| | | | |
| **Net** | $127,200 | | |

EXHIBIT "B" Page 1 of 13

The treatment of the Claims in Class 2A and 3R shall be as follows:

1.    The Loan Documents previously executed by the Debtor in favor of Wells Fargo are as follows:

    a.    That certain letter agreement dated June 5, 2007 ("Letter Agreement") which outlined the terms and conditions pursuant to which Wells Fargo would extend credit to Debtor.

    b.    That certain letter amendment dated June 20, 2008 ("Letter Amendment") whereby Wells Fargo and Debtor, inter alia, agreed to amend certain terms of the Letter Agreement.

    c.    That certain Term Note dated June 1, 2006 executed by Debtor in the original principal amount of $4,000,000 ("Term Note No. 1"), having an original final payment maturity date of June 5, 2012.

    d.    That certain Term Note dated June 23, 2005 executed by Debtor in the principal sum of $9,500,000 ("Term Note No. 2"), having an original final payment maturity date of July 5, 2012. Term Note No. 1 and Term Note No. 2 shall hereinafter collectively be referred to as the "Term Notes".

    e.    That certain Deed of Trust and Assignment of Rents and Leases executed as of June 1, 2006 ("Deed of Trust") by the Debtor and Albert Xavier, Trustee of the Frank J. Gomes Irrevocable Family Trust dated April 8, 2002 ("Gomes Trust"), in favor of American Securities Company, as Trustee for the benefit of Wells Fargo, as beneficiary, with respect to the Subject Property, as that term is defined therein, which includes Dairy No. 1 and Dairy No. 2, which was recorded on June 9, 2006 in the Official Records of the Merced County Recorder's Office.

    f.    That certain ISDA Master Agreement dated as of November 29, 2007 executed by Debtor and Wells Fargo ("Master Agreement ").

    g.    That certain Schedule to the ISDA Master Agreement dated as of November 29, 2007 executed by Debtor ("Schedule"), which supplemented the terms of the Master Agreement.

    h.    That certain Confirmation dated June 20, 2005 ("Confirmation No. 1") executed by Debtor and Wells Fargo evidencing an interest rate swap transaction with Trade ID 35415, Trade Date of June 17, 2005 and an initial Notional Amount of $9,500,000.00 (the "35415 Swap Transaction"), (2) that certain Confirmation dated May 31, 2006 ("Confirmation No. 2") executed by Debtor and Wells Fargo evidencing an interest rate swap transaction with Trade ID 91898, Trade Date of May 26, 2006 and an initial Notional Amount of $4,000,000.00 (the "91898 Swap Transaction"), and (3) that certain ISDA Confirmation dated December 13, 2007 ("Confirmation No.

3," together with the Master Agreement, the Schedule, Confirmation No. 1 and Confirmation No. 2, the "Swap Agreement") executed by Debtor and Wells Fargo evidencing an interest rate swap transaction with Trade ID 248780, Trade Date of November 29, 2007 and an initial Notional Amount of $4,000,000.00 (the "248780 Swap Transaction" and together with the 35415 Swap Transaction and the 91898 Swap Transaction, the "Swap Transactions" and individually a "Swap Transaction").

i.    That certain Revolving Line of Credit Note dated June 20, 2008 executed by Debtor in the original principal amount of $2,000,000 having a final payment maturity date of June 5, 2009 ("Revolving Note No. 1").

j.    That certain Revolving Line of Credit Note dated June 20, 2008 executed by Debtor in the original principal amount of $4,000,000 having a final payment maturity date of June 5, 2009 ("Revolving Note No. 2"). Revolving Note No. 1 and Revolving Note No. 2 shall hereinafter collectively be referred to as the "Revolving Notes".

k.    That certain Continuing Security Agreement-Rights to Payment and Inventory dated June 5, 2007 executed by Debtor ("RTP Security Agreement") wherein Debtor granted a security interest to Wells Fargo in various items of collateral including, inter alia, all Rights to Payment, Inventory and Proceeds (as those terms are defined therein) to secure all present and future indebtedness of Debtor to Wells Fargo ("RTP Collateral").

l.    That certain Security Agreement- Equipment dated June 5, 2007 executed by Debtor ("Equipment Security Agreement") wherein Debtor granted a security interest to Wells Fargo in various items of collateral including, inter alia, all goods, tools, machinery, furnishings, furniture and other equipment now or thereafter owned by Debtor and all Proceeds (as that term is defined therein) thereof to secure all present and future indebtedness of Debtor to Wells Fargo ("Equipment Collateral").

m.    That certain Security Agreement-Livestock dated June 5, 2007 executed by Debtor ("Livestock Security Agreement") wherein Debtor granted a security interest to Wells Fargo in various items of collateral including, inter alia, all farm products consisting of livestock and poultry, born or unborn, including aquatic goods produced in aquacultural operations, and all feed, medicines and other supplies used or produced in Debtor's farming operations now or thereafter owned by Debtor and all Proceeds (as that term is defined therein) thereof to secure all present and future indebtedness of Debtor to Wells Fargo ("Livestock Collateral").

n.    That certain Security Agreement-Crops dated June 5, 2007 executed by Debtor ("Crops Security Agreement") wherein Debtor granted a security interest to Wells Fargo in various items of collateral including, inter alia, all farm products consisting of crops, including crops produced on trees, vines, and bushes and aquatic goods produced in aquacultural operations, and all supplies

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

used or produced in Debtor's farming operations now or thereafter owned by Debtor and all Proceeds (as that term is defined therein) thereof to secure all present and future indebtedness of Debtor to Wells Fargo ("Crops Collateral").

o.   That certain Assignment Production Base and Pool Quota dated June 23, 2005 ("Assignment") wherein Debtor granted, transferred, and assigned to Wells Fargo a security interest in all of Debtor's Production Base and Pool Quota as security for any and all Indebtedness (as those terms are defined therein). The RTP Security Agreement, Equipment Security Agreement, Livestock Security Agreement, and the Crops Security Agreement are hereinafter collectively referred to as the "Security Agreements". The RTP Collateral, Equipment Collateral, Livestock Collateral, the Crops Collateral, and the Production Base and Pool Quota are hereinafter collectively referred to as the "Collateral". The Letter Agreement, Letter Amendment, Term Notes, Revolving Notes, Deed of Trust, the Assignment, the Security Agreements, the Swap Agreement, and all documents and instruments executed in connection therewith are hereinafter collectively referred to as the "Secured Loan Documents".

## The Dairy Note

2.   The Term Notes shall be combined into a single promissory note which shall hereinafter be referred to as the "Dairy Note". The Dairy Note shall have an initial principal balance on the Effective Date equal to the sum of (i) the combined principal balances of the Term Notes as of the Effective Date, (ii) the amount of the termination fee owed by the Debtor to Wells Fargo as a result of the termination of the Swap Agreement, and (iii) all accrued but unpaid interest, interest at the contract rate, attorneys' fees and costs, and other amounts due under the Term Notes as of the Effective Date. All outstanding obligations due and owing by the Debtor to Wells Fargo pursuant to the Dairy Note shall be fully due and payable 18 months from the Effective Date (the "Dairy Note Maturity Date"). Repayment of the Dairy Note shall be secured by the Deed of Trust and the Collateral.

3.   Effective as of the Effective Date, interest shall accrue on all outstanding obligations due and owing by the Debtor to Wells Fargo pursuant to the Dairy Note at the floating rate of LIBOR plus 4.00%.

4.   Commencing on the 2nd day of the calendar month following the Effective Date and continuing on the 2nd day of each and every month thereafter through and including the 2nd day of the month in which the Dairy Note Maturity Date occurs, the Debtor shall pay

Exhibit B-3

Wells Fargo an amount equal to the sum of the accrued and unpaid interest due and owing by the Debtor to Wells Fargo pursuant to the Dairy Note for the preceding calendar month. The Debtor shall establish a deposit account with Wells Fargo (the "Account") which Wells Fargo shall be permitted to automatically debit in order to make any monthly payments of principal and interest required to be paid by the Debtor to Wells Fargo pursuant to the terms of the Dairy Note, subject to the condition that Wells Fargo deliver to the Debtor via facsimile an invoice in the amount of the payment at least 3 business days prior to debiting the Account.

5. The Debtor shall deliver to Wells Fargo a monthly statement from the Dairy Herd Improvement Association (the "DHIA Statement"), on the 3rd Thursday of each month, or within 3 calendar days of the Debtor's receipt of the DHIA Statement, which shall be no later than the 23rd calendar day of each month, whichever is later. In addition, the Debtor shall cause Saputo Cheese to directly deliver to Wells Fargo a creamery advance statement (the "Creamery Advance Statement") or the Debtor shall directly deliver to Wells Fargo the Creamery Advance Statement if Saputo Cheese fails to do so, on the 1st and 15th calendar day of each month.

### The Feed/Herd Note

6. The Revolving Notes shall be combined into a single promissory note and shall be referred to as the "Feed/Herd Note". The Feed/Herd Note shall have initial principal balance on the Effective Date equal to the sum of (i) the combined principal balances of the Revolving Notes as of the Effective Date and (ii) all accrued but unpaid interest, interest at the contract rate, and other amounts due under the terms of the Revolving Notes as of the Effective Date. All outstanding obligations due and owing by the Debtor to Wells Fargo pursuant to the Feed/Herd Note shall be fully due on 18 months from the Effective Date (the "Feed/Herd Note Maturity Date"). Repayment of the Feed/Herd Note shall be secured by the Collateral.

///
///

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

Exhibit B-4

7. Effective as of the Effective Date, interest shall accrue on all outstanding obligations due and owing by the Debtor to Wells Fargo pursuant to the Feed/Herd Note at a floating rate of LIBOR plus 4.00%.

8. Commencing on the 2nd day of the calendar month following the Effective Date and continuing on the 2nd day of each and every month thereafter through and including the 2nd day of the month in which the Feed/Herd Note Maturity Date occurs, the Debtor shall pay Wells Fargo (i) an amount equal to the sum of accrued and unpaid interest due and owing by the Debtor to Wells Fargo pursuant to the Feed/Herd Note for the preceding calendar month, and (ii) the monthly principal sum of $40,000.00. Wells Fargo shall be permitted to automatically debit the Account in order to make any monthly payments of principal and interest required to be paid by the Debtor to Wells Fargo pursuant to the terms of the Feed/Herd Note, subject to the condition that Wells Fargo deliver to the Debtor by facsimile an invoice in the amount of the payment at least 3 business days prior to debiting the Account.

9. Commencing on the earlier of the following dates and continuing monthly thereafter as set forth below (any such date, a "Feed/Herd Note Trigger Date"), the Debtor shall pay to Wells Fargo the total monthly principal sum of $125,000.00, which shall be applied to the outstanding principal obligations due and owing by the Debtor to Wells Fargo pursuant to the Feed/Herd Note:

   a. January 2, 2011 and continuing on the 2nd day of each and every month thereafter;

   b. The 2nd calendar day of the month following the date of Wells Fargo's receipt of the DHIA Statement, which states that the Debtor owns 3,500 or more cows (the "Feed/Herd Note Cow Trigger");

   c. The 7th calendar day of the month in which Wells Fargo receives the Creamery Advance Statement on the 1st day of the month, which states that the Debtor's cows are producing 26,350 average gallons per day (the "Feed/Herd Gallon Note Trigger"); or

///

ıcCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

Exhibit B-5

d.     The 21st calendar day of the month in which Wells Fargo receives the Creamery Advance Statement on the 15th calendar day of the month, which states a Feed/Herd Gallon Note Trigger has occurred.

Wells Fargo shall be permitted to automatically debit the Account to make these monthly principal payments, as follows (i), as to a Feed/Herd Note Trigger Date based on the Feed/Herd Note Cow Trigger, Wells Fargo shall be permitted to debit the Account in the amount of $125,000.00 on the 2nd calendar day of the month subject to the condition that Wells Fargo deliver to the Debtor via facsimile an invoice in the amount of $125,000.00 at least 3 business days prior to debiting the Account, and (ii) up to the Feed/Herd Note Trigger Date based on a Feed/Herd Note Gallon Trigger, Wells Fargo shall be permitted to debit the Account in the amount of $40,000.00 on the 2nd calendar day of each month subject to the condition that Wells Fargo deliver to Debtor by facsimile an invoice in the amount of the payment at least 3 business days prior to debiting the Account and to thereafter debit the Account for the additional principal payment of $85,000.00 on the 7th or 21st calendar day of that same month, subject to the condition that Wells Fargo deliver to the Debtor via facsimile an invoice in the amount of $85,000.00 at least 3 business days prior to debiting the Account. In no event shall the sum of the interest payment and the $125,000.00 monthly principal payment exceed $166,667.00. If the sum does exceed $166,667.00, $125,000.00 shall be applied to principal with the balance to interest. Any shortfall in the accrued monthly interest shall be payable at each Note Maturity Date, unless such Maturity Dates are extended as provided herein. The $166,667.00 monthly payment shall be payable $8,334.00 on the second of each month and $8,334.00 on the seventeenth of each month.

10.     Once a Feed/Herd Note Trigger Date occurs, the Debtor shall be obligated to make monthly principal payments to Wells Fargo of $125,000.00 on the 2nd calendar day of the month following the Feed/Herd Note Trigger Date notwithstanding (i) any decrease in the number of cows owned by the Debtor below 3,500 cows, or (ii) any decrease in the

///

average number of gallons per day being produced by the Debtor's cows below 26,350 gallons.

## General Terms

11.  In addition to the principal payments required to be paid by the Debtor to Wells Fargo pursuant to the terms of the Feed/Herd Note and/or Dairy Note, the Debtor shall pay to Wells Fargo additional principal payments as set forth below (the "Bonus Principal Payments"):

a.  An amount equal to the following:  [The difference between the actual average gallons per day which the Debtor's cows are producing as set forth on the Creamery Advance Statement and 26,350] multiplied by [$13.90] multiplied by 0.25 (the "Average Gallons Per Day Bonus Principal Trigger") on the 7th calendar day of the month in which Wells Fargo receives the Creamery Advance Statement which states that the Debtor's cows are producing in excess of 26,350 average gallons per day, if the Creamery Advance Statement is received by the 1st calendar day of the month, or on the 21st calendar day of the month if the Creamery Advance Statement is received on the 15th calendar day of the month; or

b.  An amount equal to 50% of the increase of the milk price set forth on the Creamery Advance Statement in excess of $13.90 (the "Price Increase") on the 7th calendar day of the month in which Wells Fargo receives the Creamery Advance Statement which states that the Price Increase has occurred if the Creamery Advance Statement is received by the 1st calendar day of the month or on the 21st calendar day of the month in which Wells Fargo receives a Creamery Advance Statement which states that the Price Increase has occurred if the Creamery Advance Statement is received on the 15th calendar day of the moth.

The Bonus Principal Payments shall first be applied to the outstanding principal obligations due and owing by the Debtor to Wells Fargo pursuant to the Feed/Herd Note until all outstanding obligations due and owing by the Debtor to Wells Fargo thereunder have been paid in full and thereafter shall be applied to the outstanding principal obligations due and owing by the Debtor to

IcCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

Wells Fargo pursuant to the Dairy Note. Wells Fargo shall be permitted to debit the Account in order to pay to Wells Fargo the Bonus Principal Payments subject to the condition that Wells Fargo deliver to the Debtor via facsimile an invoice in the amount of the Bonus Principal Payments at least 3 business days prior to debiting the Account.

12. In addition to the monthly reporting required to be delivered by the Debtor to the Bank as set forth in paragraph 5 above, the Debtor shall provide Wells Fargo with the following additional reporting:

    a. The Debtor shall deliver to Wells Fargo, on the 10th day of each month, a livestock position report and feed inventory report estimated by the Debtor;

    b. The Debtor shall deliver to Wells Fargo, on the 10th day of each month, a report stating the average daily gallons of milk being produced by the cows owned by the Debtor as of the last day of the preceding calendar month;

    c. The Debtor shall deliver to Wells Fargo, on the 10th day of the month, an actual monthly operating statement on a cash basis for the preceding month; and

    d. All reports delivered by the Debtor to Wells Fargo shall be in form reasonably satisfactory to Wells Fargo.

13. The Dairy Note Maturity Date and the Feed/Herd Note Maturity Date shall hereinafter be referred to as the "Note Maturity Dates". If and only if no event of default occurs that has not been cured on or before the Note Maturity Dates under the Dairy Note, Feed/Herd Note, and the Loan Modification Agreement (as hereinafter defined) on or before the Note Maturity Dates, the Note Maturity Dates shall be extended for an additional 24 calendar months (the "First Extended Maturity Dates") if the Debtor makes an additional principal payment to Wells Fargo of $500,000.00 on or before the Note Maturity Dates (the "$500,000 Extension Payment"). The $500,000 Extension Payment, if paid by the Debtor to Wells Fargo, shall be applied to the outstanding principal balance due and owing by the Debtor to Wells Fargo pursuant to the terms of the Feed/Herd Note. Any Bonus Principal Payments previously paid by the Debtor to Wells Fargo prior to the Note Maturity Dates shall be credited to the $500,000 Extension Payment which must be paid to Wells Fargo

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

in order to obtain a 24 month extension of the Note Maturity Dates.

14.  In the event the Debtor timely and punctually pays to Wells Fargo the $500,000.00 Extension Payment and the Note Maturity Dates are extended to the First Extended Maturity Dates, the Debtor shall continue making monthly interest only payments pursuant to the Dairy Note on the 2nd day of each calendar month as more specifically set forth in Section 4 above, shall continue to make principal payments of $125,000.00 per month and monthly interest payments pursuant to the Feed/Herd Note as more specifically set forth in Sections 8 and 9a. above, and shall continue paying to Wells Fargo the Bonus Principal Payments required to be paid by Wells Fargo as more specifically set forth in Section 11 above.  Wells Fargo shall be permitted to automatically debit the Account in order to make any monthly payments of principal and interest and the Bonus Principal Payments required to be paid by the Debtor to Wells Fargo during the period of time commencing on the Note Maturity Dates and continuing through the First Extended Maturity Date.

15.  If and only if no Event of Default occurs under the Dairy Note, the Feed/Herd Note and the Loan Modification Agreement on or before the First Extended Maturity Date that has not been cured on or before  the Note Maturity Dates, then if the Debtor makes an additional principal payment to Wells Fargo of $1,000,000.00 during the time period commencing on the Note Maturity Dates and continuing through and including the First Extended Maturity Date (the "$1,000,000 Extension Payment") , then the maturity date of the Dairy Note and Feed/Herd Note shall be extended for an additional 12 calendar months (the "Second Extended Maturity Date").   Any Bonus Principal Payments previously paid by the Debtor to Wells Fargo on or after the Note Maturity Dates and continuing through and including the First Extended Maturity Date shall be credited to the $1,000,000 Extension Payment which must be paid to Wells Fargo in order to obtain another 12 month extension of the Note Maturity Dates.   The $1,000,000 Extension Payment, if paid by the Debtor to Wells Fargo, shall first be applied to the outstanding principal balance due and owing by the Debtor to Wells Fargo pursuant to the Feed/Herd

Exhibit B-9

1    Note and thereafter to the outstanding principal balance due and owing by the Debtor to

2    Wells Fargo pursuant to the Dairy Note.

3    16.   In the event the Debtor timely and punctually pays to Wells Fargo the $1,000,000

4    Extension Payment and the maturity date of the Dairy Note is extended to the Second

5    Extended Maturity Date, the Debtor shall continue to make monthly principal payments to

6    Wells Fargo of $125,000.00 on the 2nd calendar day of the month, which principal

7    payment shall be applied to the outstanding obligations due and owing by the Debtor to

8    Wells Fargo pursuant to the Dairy Note, and shall continue to make monthly interest only

9    payments pursuant to the Dairy Note on the 2nd day of the calendar month as more

10   specifically set forth in Section 4 above, and shall continue to paying to Wells Fargo the

11   Bonus Principal Payments as more specifically set forth in Section 11 above. Wells Fargo

12   shall be permitted to automatically debit the Account in order to make the monthly

13   payments of principal and interest and the Bonus Principal Payments required to be paid

14   by the Debtor to Wells Fargo during the period of time commencing on the First Extended

15   Maturity Dates and continuing through the Second Extended Maturity Dates. The Debtor

16   ,may prepay the outstanding obligations owed by the Debtor to Wells Fargo pursuant to

17   the Dairy Note at any time, without penalty.

18   17.   The Dairy Note shall continue to be secured by the Deed of Trust and the Collateral and

19   the Feed/Herd Note shall continue to be secured by the Collateral.

20   18.   The Secured Loan Documents shall remain in effect, but shall be modified as of the

21   Effective Date by a loan modification agreement ("Loan Modification Agreement") to

22   reflect the foregoing terms. The restructured loan documents will consist of the Secured

23   Loan Documents for the Dairy Note, the Feed/Herd Note and the Loan Modification

24   Agreement (the foregoing, the "Wells Fargo Core Restructured Loan Documents"),

25   together with those ancillary agreements, certificates, instructions, and authorizations

26   reasonably requested by Wells Fargo. The Wells Fargo Core Restructured Loan

27   Documents have not yet been drafted or agreed upon by Debtor or Wells Fargo, and

28   agreement on the form and substance of such documents is a condition precedent for

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

Exhibit B-10

1  confirmation of the Plan. Debtor will file the forms of the Wells Fargo Core Restructured

2  Loan Documents in the Case not later than five court days prior to the hearing on

3  confirmation of this Plan.

4  19. The liens and security interests securing the Loans will be deemed perfected as of the

5  Effective Date without further act or filing by Wells Fargo, but Wells Fargo will be

6  authorized to file or take other appropriate action to perfect or evidence the perfection of

7  any such liens or security interests as it may desire, and Debtor shall cooperate therewith.

8  20. In connection with the execution of the Loan Modification Agreement, the Debtor and the

9  Xavier Trust shall execute a stipulation for the ex parte appointment of a receiver, to

10  which shall be attached an order appointing a receiver over the Debtor and the Xavier

11  Trust ("Receiver Stipulation"). The Loan Modification Agreement shall further provide

12  that, upon the occurrence of an event of default under the Loan Modification Agreement,

13  Wells Fargo shall have the right to file an action against the Debtor and the Xavier Trust

14  in a court of competent jurisdiction and to present the Receiver Stipulation to said court,

15  requesting that a receiver shall be appointed over the Debtor and the Xavier Trust. The

16  Loan Modification Agreement shall further provide that, in the event a bankruptcy case is

17  filed by or against the Debtor and/or the Xavier Trust, that sufficient cause exists for the

18  bankruptcy court having jurisdiction over such bankruptcy case to grant Wells Fargo relief

19  from the automatic stay to enable Wells Fargo to enforce its rights against the Subject

20  Property and the Collateral, that the Debtor and the Xavier Trust irrevocably consent and

21  waive any rights to object to, and Wells Fargo shall be entitled to, an order granting relief

22  from any and all such stays, including the automatic stay imposed by 11 U.S.C. § 362

23  and/or equitable relief under 11 U.S.C. § 105, or other applicable law, and shall further

24  provide that any future bankruptcy case filed by the Debtor or the Xavier Trust shall be

25  deemed to have been filed in bad faith.

26  21. That certain Intercreditor Agreement entered into as of November 10, 2006 by and

27  between the BM&A Retirement Trust, Wells Fargo and WFEFI shall remain in full force

28  and effect.

Exhibit B-11

1    22.  The Debtor shall deliver to Wells Fargo on or before the Effective Date access
2         agreements, in form and substance reasonably satisfactory to Wells Fargo, with respect to
3         the Debtor's interest as a tenant in the leases described in Class 4A, Class 4B and
4         Class 4C, which will provide, _inter_ _alia_, that if a default occurs under the Core
5         Restructured Loan Documents, Wells Fargo shall have the right to obtain access to the
6         leased properties which are the subject of Classes 4A, 4B and 4C in order to harvest any
7         crops being grown by the Debtor thereon.

8    23.  The Continuing Guarantys executed by Frank J. Gomes, Albert Xavier, Frank J. Gomes,
9         aka Francisco Jose Gomes, Trustee of the Frank J. Gomes Separate Property Trust dated
10        June 2, 2003, and Albert Xavier, Trustee of the Frank J. Gomes Irrevocable Family Trust
11        dated April 9, 2003, shall remain in full force and effect, and shall not in any way be
12        waived, modified, impaired or exonerated as a result of the restructuring the Wells Fargo
13        Loan Documents accomplished in the Plan.

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA  93720-1501

EXHIBIT "C" Page 1 of 7

**EXHIBIT C**

The treatment of the Claims in Class 3J, Class 3K, Class 3L, Class 3M, Class 3N, Class 3O, Class 3P and Class 3Q Claims shall be as follows:

1.    The Lease Documents previously executed by the Debtor in favor of WFEFI are as follows:

    a.    Master Lease No. 152856 dated as of September 7, 2005 ("Master Lease");

    b.    Security Agreement dated as of September 7, 2005 and Amendment to Security Agreement dated September 7, 2005 (collectively, the "WFEFI Security Agreement") pursuant to which the Debtor granted WFEFI a security interest in, inter alia, all inventory, equipment, accounts and other rights to payment and general intangibles and other property (the "WFEFI Collateral");

    c.    Supplement to Master Lease No. 0152856-400 dated as of September 7, 2005 ("Supplement No. 1"), pursuant to which the Debtor leased a 2006 Peterbilt #385;

    d.    Supplement to Master Lease No. 0152856-401 dated as of September 11, 2005 ("Supplement No. 2"), pursuant to which the Debtor leased an H.D. Wilcox Chisel, Star Crumbler and Case I8 Stubble Disk;

    e.    Supplement to Master Lease No. 0152856-402 dated as of October 4, 2005 ("Supplement No. 3") pursuant to which the Debtor leased a 2005 Mark West Tank Trailer and related equipment;

    f.    Supplement to Master Lease No. 0152856-403 dated as of November 7, 2005 ("Supplement No. 4"), pursuant to which the Debtor leased a 2006 Sterling with Laird Mixer #2;

    g.    Supplement to Master Lease No. 0152856-404 dated as of March 1, 2006 ("Supplement No. 5"), pursuant to which the Debtor leased a 2006 379 Peterbilt Tractor;

Exhibit C-1

h.     Supplement to Master Lease No. 0152856-405 dated as of April 7, 2006 ("Supplement No. 6") pursuant to which the Debtor leased a Case STX 500 Tractor;

i.     Supplement to Master Lease No. 0152856-406 dated as of April 7, 2006 ("Supplement No. 7"), pursuant to which the Debtor leased a Versa Bagger;

j.     Supplement to Master Lease No. 0152856-407 dated as of December 7, 2007 ("Supplement No. 8"), pursuant to which the Debtor leased a 2008 Peterbilt 365 with Laird Mixer #1;

k.     The Master Lease, Security Agreement, Supplement No. 1, Supplement No. 2, Supplement No. 3, Supplement No. 4, Supplement No. 5, Supplement No. 6, Supplement No. 7 and Supplement No. 8 and all documents and instruments executed in connection therewith are hereinafter collectively referred to as the "Lease Documents". The equipment leased by WFEFI to the Debtor pursuant to the Master Lease, Supplement No. 1, Supplement No. 2, Supplement No. 3, Supplement No. 4, Supplement No. 5, Supplement No. 6, Supplement No. 7 and Supplement No. 8 is hereinafter collectively referred to as the "Equipment".

**SUPPLEMENT NO. 1, SUPPLEMENT NO. 2 AND SUPPLEMENT NO. 3**

5.     Supplement No. 1 shall have an initial principal balance on the Effective Date equal to the sum of (i) the unpaid balance due under Supplement No. 1 as of the Effective Date, and (ii) all accrued but unpaid amounts due and owing pursuant to Supplement No. 1 as of the Effective Date including, without limitation, attorneys' fees and costs ("the "Supplement No. 1 Modification"). All outstanding obligations due and owing by the Debtor to WFEFI pursuant to the Supplement No. 1 Modification shall be fully due and payable 12 months from the Effective Date, shall bear interest at the fixed rate of 7.00% per annum, and shall be paid in 12 equal monthly installments of principal and interest, commencing on the 20th day of the calendar month following the Effective Date.

6.     Supplement No. 2 shall have an initial principal balance on the Effective Date equal to the sum of (i) the unpaid balance due under Supplement No. 2 as of the Effective Date, and

Exhibit C-2

1  (ii) all accrued but unpaid amounts due and owing pursuant to Supplement No. 2 as of the

2  Effective Date including, without limitation, attorneys' fees and costs ("the "Supplement

3  No. 2 Modification"). All outstanding obligations due and owing by the Debtor to WFEFI

4  pursuant to Supplement No. 2 Modification shall be fully due and payable 12 months from

5  the Effective Date, shall bear interest at the fixed rate of 7.00% per annum, and shall be

6  paid in 12 equal monthly installments of principal and interest, commencing on the 20th

7  day of the calendar month following the Effective Date.

8  7.  Supplement No. 3 shall have an initial principal balance on the Effective Date equal to the

9  sum of (i) the unpaid balance due under Supplement No. 3 as of the Effective Date, and

10  (ii) all accrued but unpaid amounts due and owing pursuant to Supplement No. 3 on the

11  Effective Date including, without limitation, attorneys' fees and costs ("the "Supplement

12  No. 3 Modification"). All outstanding obligations due and owing by the Debtor to WFEFI

13  pursuant to Supplement No. 3 Modification shall be fully due and payable 12 months from

14  the Effective Date, shall bear interest at the fixed rate of 7.00% per annum, and shall be

15  paid in 12 equal monthly installments of principal and interest, commencing on the 20th

16  day of the calendar month following the Effective Date.

17  **SUPPLEMENT NO. 4, SUPPLEMENT NO. 5 AND SUPPLEMENT NO. 6, SUPPLEMENT**
**NO. 7 AND SUPPLEMENT NO. 8**

18

19  8.  Supplement No. 4 shall have an initial principal balance on the Effective Date equal to the

20  sum of (i) the unpaid balance due under Supplement No. 4 as of the Effective Date, and

21  (ii) all accrued but unpaid amounts due and owing pursuant to Supplement No. 4 as of the

22  Effective Date including, without limitation, attorneys' fees and costs ("the "Supplement

23  No. 4 Modification"). All outstanding obligations due and owing by the Debtor to WFEFI

24  pursuant to Supplement No. 4 Modification shall be fully due and payable 48 months from

25  the Effective Date, shall bear interest at the fixed rate of 7.00% per annum, and shall be

26  paid in 48 equal monthly installments of principal and interest, commencing on the 20th

27  day of the calendar month following the Effective Date.

28

Exhibit C-3

9.    Supplement No. 5 shall have an initial principal balance on the Effective Date equal to the sum of (i) the unpaid balance due under Supplement No. 5 as of the Effective Date, and (ii) all accrued but unpaid amounts due and owing pursuant to Supplement No. 5 on the Effective Date including, without limitation, attorneys' fees and costs ("the "Supplement No. 5 Modification"). All outstanding obligations due and owing by the Debtor to WFEFI pursuant to Supplement No. 5 Modification shall be fully due and payable 48 months from the Effective Date, shall bear interest at the fixed rate of 7.00% per annum, and shall be paid in 12 equal monthly installments of principal and interest, commencing on the 20th day of the calendar month following the Effective Date.

10.    Supplement No. 6 shall have an initial principal balance on the Effective Date equal to the sum of (i) the unpaid balance due under Supplement No. 6 as of the Effective Date, and (ii) all accrued but unpaid amounts due and owing pursuant to Supplement No. 6 as of the Effective Date including, without limitation, attorneys' fees and costs ("the "Supplement No. 6 Modification"). All outstanding obligations due and owing by the Debtor to WFEFI pursuant to Supplement No. 6 Modification shall be fully due and payable 48 months from the Effective Date, shall bear interest at the fixed rate of 7.00% per annum, and shall be paid in 48 equal monthly installments of principal and interest, commencing on the 20th day of the calendar month following the Effective Date.

11.    Supplement No. 7 shall have an initial principal balance on the Effective Date equal to the sum of (i) the unpaid balance due under Supplement No. 7 as of the Effective Date, and (ii) all accrued but unpaid amounts due and owing pursuant to Supplement No. 7 as of the Effective Date including, without limitation, attorneys' fees and costs ("the "Supplement No. 7 Modification"). All outstanding obligations due and owing by the Debtor to WFEFI pursuant to Supplement No. 7 Modification shall be fully due and payable 48 months from the Effective Date, shall bear interest at the fixed rate of 7.00% per annum, and shall be paid in 48 equal monthly installments of principal and interest, commencing on the 20th day of the calendar month following the Effective Date.

McCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA  93720-1501

Exhibit C-4

12.     Supplement No. 8 shall have an initial principal balance on the Effective Date equal to the sum of (i) the unpaid balance due under Supplement No. 8 as of the Effective Date, and (ii) all accrued but unpaid amounts due and owing pursuant to Supplement No. 8 on the Effective Date including, without limitation, attorneys' fees and costs ("the "Supplement No. 8 Modification"). All outstanding obligations due and owing by the Debtor to WFEFI pursuant to Supplement No. 8 Modification shall be fully due and payable 48 months from the Effective Date, shall bear interest at the fixed rate of 7.00% per annum, and shall be paid in 48 equal monthly installments of principal and interest, commencing on the 20th day of the calendar month following the Effective Date.

## GENERAL TERMS

13.     The Master Lease, Supplement No. 1, Supplement No. 2, Supplement No. 3, Supplement No. 4, Supplement No. 5, Supplement No. 6, Supplement No. 7 and Supplement No. 8 shall continue to be secured by the WFEFI Security Agreement.

14.     The Lease Documents shall remain in effect, but shall be modified as of the Effective Date by a Lease Modification Agreement ("Lease Modification Agreement"), to reflect the foregoing terms. The restructured lease documents will consist of the Lease Documents and the Lease Modification Agreement (the foregoing, the "WFEFI Core Restructured Lease Documents"), together with those ancillary agreements, certificates, instructions and authorizations reasonably requested by WFEFI. The WFEFI Core Restructured Lease Documents have not yet been drafted or agreed upon by Debtor or WFEFI, and agreement on the form and substance of such documents is a condition precedent for the confirmation of the Plan. Debtor will file the forms of the WFEFI Core Restructured Lease Documents in the Case not later than five court days prior to the hearing on confirmation of this Plan.

15.     The liens and security interests securing the Master Lease, Supplement No. 1, Supplement No. 2, Supplement No. 3, Supplement No. 4, Supplement No. 5, Supplement No. 6, Supplement No. 7 and Supplement No. 8 will be deemed perfected as of the Effective Date without further act or filing by WFEFI, but WFEFI will be authorized to file or take

Exhibit C-5

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PARK PLACE EAST
FRESNO, CA 93720-1501

other appropriate action to perfect or evidence the perfection of any such liens or security interests as it may desire, and Debtor shall cooperate therewith.

16. The Lease Modification Agreement shall further provide that, in the event a bankruptcy case is filed by or against the Debtor, that sufficient cause exists for the bankruptcy court having jurisdiction over such bankruptcy case to grant WFEFI relief from the automatic stay to enable WFEFI to enforce its rights against the Equipment and the WFEFI Collateral, that the Debtor irrevocably consents and waives any rights to object to, and WFEFI shall be entitled to, an order granting relief from any and all such stays, including the automatic stay imposed by 11 U.S.C. § 362 and/or equitable relief under 11 U.S.C. § 105, or other applicable law, and shall further provide that any future bankruptcy case filed by the Debtor shall be deemed to have been filed in bad faith.

17. The certain Intercreditor Agreement entered into as of November 10, 2006 by and between the BM&A Retirement Trust, Wells Fargo and WFEFI shall remain in full force and effect.

18. The Continuing Guarantys executed by Frank J. Gomes, Albert Xavier, Frank J. Gomes, Separate Property Trust dated June 2, 2003, and the Frank J. Gomes Irrevocable Family Trust dated April 9, 2003, shall remain in full force and effect, and shall not in any way be waived, modified, impaired or exonerated as a result of the restructuring the WFEFI Lease Documents accomplished in the Plan.

17189/00011-1572930.v1

1cCORMICK, BARSTOW,
SHEPPARD, WAYTE &
CARRUTH LLP
5 RIVER PLACE EAST
FRESNO, CA 93720-1501

Exhibit C-6